PELLETTIERI, RABSTEIN AND ALTMAN
100 Nassau Park Boulevard, Suite 111
CN 5301
Princeton, New Jersey 08543-5301
(609) 520-0900
Attorneys for Plaintiff

STEMBER FEINSTEIN DOYLE & PAYNE, LLC
Allegheny Building
17th Floor
429 Forbes Avenue
Pittsburgh, PA 15219-1639
(412) 281-8400
*Of Counsel* for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIRGILIO S. CASAYURAN, JR., on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PNC BANK, NATIONAL ASSOCIATION,<br><br>Defendant. | Civil Action No.<br><br>**PLAINTIFF'S CLASS ACTION COMPLAINT AND JURY DEMAND** |

## I.    NATURE OF ACTION

1.    Plaintiff Virgilio S. Casayuran, Jr. ("Plaintiff") brings this class action on behalf of himself and other similarly situated New Jersey customers ("Customers") of PNC Bank, National Association ("PNC"). Plaintiff and Customers have been harmed by PNC's unfair,

deceptive, and unconscionable policy and practices by which it manipulates Customer accounts and transactions to intentionally increase the number of overdrafts and thereby maximize PNC's resulting earnings from overdraft fees.  PNC rearranges the chronological order of a Customer's debit charges to the Customer checking account so that the highest charges are subtracted from available funds before lower charges and manipulates the timing and posting of debits.  This "high to low" debit resequencing policy ("Debit Ordering Policy") results in increased numbers of overdrafts for Customers and in turn substantial enhanced fees and profits for PNC.

2.     Plaintiff and Customers all have checking accounts with PNC which issues them debit cards. Customers can and do use the debit cards to directly and instantaneously access account funds for purchases (both at physical point of sale or on-line), bill payment, cash withdrawals, and other electronic debit transactions. On information and belief, PNC receives notice of these electronic charges at or about the time they are incurred. Customers reasonably expect that PNC posts their debits in the order in which it receives notice of a debit transaction. However, contrary to this reasonable assumption, PNC reorders the charges to maximize the number of overdrafts and the associated service fees ("Overdraft Charges") charged to Customers, thereby increasing PNC's income.

3.     PNC's actions are unconscionable, unfair, misleading and deceptive and thereby violate the New Jersey Consumer Fraud Act ("NJCFA"), constitute a breach of PNC's duty of good faith and fair dealing, and constitute unjust enrichment.

## II. THE PARTIES

4.     Plaintiff Virgilio S. Casayuran, Jr. is a citizen of  the state of New Jersey, residing at 107 Laidlaw Ave. Apt I, Jersey City, NJ. 07306.  He brings this action on behalf of himself and a class of all those similarly situated.

**5.**     Defendant PNC Bank, National Association, also known as PNC Bank, N.A., ("PNC") is a banking subsidiary of PNC Bancorp. Inc. and PNC Financial Services, Inc. operating under the banking laws of the United States.  Its headquarters and principal place of business is located at 1 PNC Plaza 21th Floor, 249 Fifth Avenue, Pittsburgh, PA 15222.  PNC has an extensive branch network, primarily located in New Jersey, Pennsylvania, Maryland, Washington, DC, Delaware, Virginia, Ohio, Kentucky, Indiana, Illinois, Michigan, Missouri, Wisconsin, and Florida.  This network services customers through 2,589 offices.

### III. JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A). The Court also has Federal Question jurisdiction over the matter as defendant PNC is a national banking association. 28 U.S.C. §1331.

7.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) because the acts giving rise to the claims of Plaintiff and the class occurred in this district, Plaintiff and members of the class are residents of this district, and because Defendant conducts substantial business in this judicial district. Defendant has sufficient minimum contacts with the State of New Jersey and intentionally avails itself of the consumers and markets within the State of New Jersey through the location of branch banks, promotion, marketing, sale, and service of checking and savings accounts in this State.

### IV. FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS

8.      PNC is one of New Jersey's major banking companies and maintains over 1,525 ATM's and branch offices throughout New Jersey.

9.      At all times relevant to this matter, Plaintiff has held a personal checking account in the Journal Square, Jersey City, New Jersey branch of PNC.

10.      PNC has the ability to provide virtually instantaneous banking services to consumers, and as a major part of its marketing informs consumers that they can have instant access to their current account transactions and account balances and encourages Customers to perform banking functions at ATM machines and online.

11.      Despite its ability to provide instantaneous banking transaction information, PNC uses its power and position as a large sophisticated financial institution to impose unreasonable and unconscionable business policies and terms on its customers in New Jersey if they want to make the use of its debit cards.

12.      PNC successfully promotes and fosters the use of debit cards as they are a huge source of profits from the fees it charges its customers in accordance with its Overdraft Charge policies.

13.      PNC issues debit cards to its checking account customers with which they can access account funds directly and instantaneously for purchases from merchants, bill payments, cash withdrawals from ATMs, and other electronic debit transactions. Upon information and belief, these electronic charges, which can also include "holds" where a merchant asserts a debit amount higher than the actual charges to a consumer as a security matter, are routinely cleared with PNC at or about the time they are incurred.

14.     While PNC has instant electronic access to the Customer's up to date balance information at the moment s/he attempts a debit transaction, and the resulting ability, when applicable, to reject the transaction or provide notice that there are insufficient funds to cover the transaction, thereby giving the Customer the option to complete the transaction and incur overdraft fees or to use another form of payment, PNC fails to reject such transactions or provide notice to Customers of insufficient funds at the time of the transactions.

15.     Despite PNC's instant electronic access to debit information and account balances, PNC does not debit charges to Customers' accounts as they are incurred or received. Instead, PNC's regular practice is to (a) gather all debits to the account it received within a period of time; (b) then, at some time after they are received,  post them to the customer's account after first reordering them from the chronological order in which they are incurred to highest to lowest amount order; and (c) then deduct the transactions from the customer's account accordingly.

16.     Upon information and belief, PNC engages in this unfair, deceptive and unconscionable practice  of  "high to low" reordering of debits  in order to maximize the number of overdrafts Customers incur, thus increasing the amount of overdraft fees PNC  collects from its Customers.

### A. The terms of PNC's form "Account Agreement"

*(1) General Terms*

17.     PNC enters into a common and uniform Account Agreement ("Account Agreement") with all customers in New Jersey, as well as in other jurisdictions in which it does business, a true and correct specimen copy of which is attached as Exhibit 1 and incorporated herein.

18.     PNC purports to bind Customers to the terms of its Account Agreement  whether or not they have been given an opportunity to review the document:  "…By signing the signature card and/or Account Registration, by using the account, by requesting or later adding products and/or services connected to the account…"[1]  .

19.     The Account Agreement references that it is governed by the laws and regulations of the state where either the branch at which the Customer's account is opened is located or, if the account was opened by mail or on-line, by the laws of the state of the Customer's residence, provided PNC has a branch located therein.  As Plaintiff is a New Jersey resident and PNC has multiple branches in New Jersey, its law applies to the Plaintiff as well as to the class identified herein.[2]

20.     The Account Agreement consists of twenty-seven single-spaced pages, and directs its Customers to seven documents they should refer to, most of which are not contained within the Agreement itself.

21.      On information and belief, the terms set out in the Account Agreement are non-negotiable, are offered to individual consumers and debit card holders on a take it or leave it basis, and for the most part are written so as to authorize PNC to act with the widest possible discretion.

22.     In small, non-emphasized  print that appears five (5) paragraphs under the subheading "Withdrawals,"  at page 4, the  Account Agreement refers to the order of withdrawal orders as follows:

> … If there are sufficient funds to cover some but not all of your withdrawal orders, we [PNC] will exercise our discretion (i) in paying some but not all of the items, and (ii) to pay the items in any order. In exercising that discretion to pay in any order, we do not necessarily process items in the order in which we receive them. Our

---

[1]  Exhibit 1at 1.
[2]  Id. at 11.

general practice is to post withdrawals from your account in order of the largest-to-smallest dollar item; in other words, beginning with the largest dollar item, then the next-largest dollar item, and so on until we reach the last, smallest-dollar item. The order in which we process these withdrawals may affect the total amount of overdraft fees charged to your Account. If, in our sole discretion, we choose to allow withdrawals for which there are not sufficient available funds, you agree to repay us immediately the amount of the funds advanced to you. We may also assess your Account a service charge. At no time shall we be required to allow you to overdraw your Account even if we had allowed such activity on one or more prior occasions. We reserve the right to refuse to cash or to impose a charge on anyone who asks us to cash a check that you have written. Even if your check is otherwise properly payable, we will not be liable to you for dishonor of your check, or otherwise, as a result of such refusal. You agree that we do not have to notify you when we refuse to pay a check you have written, or if we pay a check which overdraws your Account, or when we impose a fee in connection with either of these events." [3]

23.     Plaintiff and Class Members do not dispute PNC's authority, as a banking institution, to charge overdraft fees, but rather challenge and object to the method and manner in which PNC conducts its Debit Ordering Policy which bears upon overdrafts, namely its practice of posting charges in high to low order for the purpose of increasing the fees it generates for itself.

### (2) The Account Agreement is adhesive and misleading in form

24.     Plaintiff and Class Members reasonably rely upon PNC to act in good faith both with regard to the terms of its Account Agreement and in the methods and manner in which it carries out those terms.

25.     Upon information and belief, the Account Agreement is a form contract, the terms of which Customers are deemed to have accepted once they open a bank account with PNC.

26.     Moreover, Plaintiff and Customers are not in a bargaining position with respect to the imposition of PNC's form Account Agreement.  Indeed, the ability of Plaintiff and other

---

[3] See "Account Agreement" at 4.

Customers to find banks that offer alternatives to the high-to-low posting of debits is diminished by the fact that most of the nation's top banks utilized a high-to-low posting policy, or reserve the discretion to use such a policy.[4]  Upon information and belief, banks engage in this practice in order, as does PNC, to maximize overdraft fee revenues, a practice that heavily impacts upon and injures Customers, such as Plaintiff, of modest income and financial situation.[5]

27.     Within the main body of the Account Agreement, PNC references, but does not include the full terms and conditions of its applicable policies. Instead, the Agreement confusingly references and incorporates separate applicable policy documents, notably, a "Funds Availability Policy" and a "Consumer Schedule of Services Charges and Fees." [6]  PNC compounds the confusion by including in the Account Agreement the policy relating to overdrafts <u>for an optional service</u>, "Overdraft Protection Agreement," that Plaintiff and many other Customers do not have.

28.     The information about PNC's normal overdraft policy is not marked or emphasized in bold type or otherwise clearly identified in the Account Agreement. Instead, part of the policy is printed in small print beginning midway in a paragraph appearing five paragraphs under the sub-heading of "Withdrawals." Other portions of the applicable overdraft charge policy are strewn about the body of the Account Agreement, not identified as part of PNC's normal overdraft policy. A separate document, PNC's Consumer Schedule of Service Charges and Fees, contains a discrete section entitled, "Other Account Charges and Fees," which does not disclose or relate PNC's overdraft policy, but does set forth the  fee schedule for such overdrafts.

---

[4]  <u>See</u> " U.S. PIRG Federation of State PIRGs August 4, 2008 Letter to the Board of Governors of the Federal Reserve System, Office of Thrift Supervision, and Secretary of the Board of the NCUA", 13-14.
[5] <u>See</u> Id. at 7.
[6] <u>See</u> <u>e.g.</u>, <u>Id.</u> at 1, 10 ("All charges and other fees mentioned in this Agreement or otherwise applicable to your Account are detailed in our Consumer Schedule of Service Charges and Fees, a copy of which has been given to you, and which is a part of this Agreement.").

29.     The confusing panoply of terms separated into the various documents that constitute PNC's overdraft policy was designed and administered to prevent PNC's customers from attaining full knowledge and understanding of how PNC will treat debits and treat and charge for overdrafts.  *Importantly, PNC's normal overdraft policy is not individually designated or brought to the consumer's attention.*

30.     Further, neither the Account Agreement nor any information concerning the processing order of checks is disclosed on PNC's website.  This, along with PNC's use of confusing multi-part documents, prevented Plaintiff and Class Members from fully comprehending the terms of PNC's overdraft policy as well as PNC's actual practices.

<u>(3)  The Account Agreement is substantively misleading and its high to<br>low policy is unconscionable</u>

31.     Plaintiff and other Customers, in addition to expecting that the terms of PNC's Agreement are fair and reasonably expect PNC to conduct itself in good faith in carrying out the Agreement's terms.  Instead of acting accordingly, PNC consistently fails to either reject transactions which will create an overdraft or give reasonable notice that attempted transactions will exceed account balances, and charges and collects excessive overdraft fees by the use of high to low reordering of debits to customer checking accounts so as to trigger overdraft fees.[7]

32.     While the Account Agreement does, in small print, disclose PNC's "general practice" of utilizing high to low order debit, it also indicates that PNC retains *discretion* with regard to the order in which transactions are posted.[8]

---

[7] "Account Agreement" at 4 ("If there are sufficient funds to cover some but not all of your withdrawal orders, we will exercise our discretion (i) in paying some but not all of the items, and (ii) to pay the items in any order…Our general practice is to post withdrawals from your account in order of the largest-to-smallest dollar item…").
[8] "Account Agreement" at 4 ("If there are sufficient funds to cover some but not all of your withdrawal orders, we will exercise our discretion (i) in paying some but not all of the items, and (ii) to pay the items in any order…Our general practice is to post withdrawals from your account in order of the largest-to-smallest dollar item…").

33.     These statements are misleading in that Customers rely on PNC to act in good faith, and thus to exercise its discretion in a manner that does not deliberately increase the numbers of overdrafts they experience. However, PNC consistently uses high to low order debit posting because it increases the number of customer overdrafts and the resulting fees, rather than using discretion to minimize them.  Exacerbating the situation is PNC's failure to have its computer system either provide notice when a transaction will exceed the customer's account balance or  discontinue processing a Debit Card transaction  that would overdraw the Customer's account.

### (4)  Plaintiff's November / December 2008 Overdraft Incident

34.     On Friday, November 28, 2008, Plaintiff made three debit card purchases for $27.20, $5.85, and $2.12, totaling $35.17.  While PNC received notice of the debits and listed them as "pending" on November 28 when Plaintiff's account contained sufficient funds to cover them, it did not post them to Plaintiff's account that day.

35.     On Sunday, November 30, two full days after PNC had notice of the three debit purchases, the New Jersey Turnpike Commission's EZ-Pass program transmitted an electronic debit request for a $70.00 payment of funds from Plaintiff's checking account per prior authorization from Plaintiff. PNC listed this $70.00 EZ-Pass charge as "pending," causing the potential for an overdraft.

36.     Early on Monday, December 1, 2008, Plaintiff's account still showed a positive account balance of $55.59, more than sufficient to cover the three debit purchases from November 28, which totaled $35.17, but not enough to cover the November 30 EZ-Pass charge. Plaintiff made a cash teller deposit of $60.00 to cover that unexpected charge before noon that same day.

37.    PNC proceeded to post the three charges from November 28, 2008  totaling $35.17 to the account later on December 1, then posted the $70 EZ-Pass charge from November 30 on December 2, but delayed crediting Plaintiff's account for his December 1, 2008 $60.00 cash deposit until December 2.

38.    PNC then charged Plaintiff's account with three $36.00 overdraft charges on December 2, 2008 and an additional $36.00 charge on December 3 for a total of $144 in overdraft charges.

39.    Had PNC deducted Plaintiff's debit purchases from his balance when it received notice of them and in the chronological order that they were made, three on November 28 and one on November 30, or even if it had deducted them when it posted them to his account, three on December 1 and one on December 2, Plaintiff would not have overdrawn his account until PNC posted the last (the EZ-Pass charge) of the four debits. Accordingly PNC would have earned fees for only a single overdraft at most.

40.    Instead of using its discretion to post the debits in a chronological manner or otherwise act in good faith toward the Plaintiff, PNC followed and applied its consistent Debit Ordering Practice and reordered the four transactions, which had taken place over a three day period, into high to low order. By manipulating the order of the transactions so that the last in time $70.00 EZ-Pass debit was deducted from his account first, PNC was able to charge Plaintiff $144.00 in fees for what in reality was less than a single $70.00 overdraw.

41.    On or about December 9, 2009, after Plaintiff complained about the multiple overdraft charges first to PNC,  to no effect, and then to the Better Business Bureau, PNC, as a purported "courtesy,"  refunded two of the four $36.00 overdraft charges it had assessed. It has not, however, altered or changed its Debit Ordering Policy causing Plaintiff and other class

11

members to continue to be subjected to overdraft fees by operation of the high to low Debit

Ordering Policy.

42.     PNC's Account Agreement imposes unfair, unconscionable, one-sided terms upon

consumers, and fails to clearly disclose to customers its actual policy and practices with regard to

overdrafts.  PNC's unfair terms and bad faith conduct create an advantage to PNC by increasing

the number of overdraft fees it would otherwise collect, providing a large source of revenue for

itself at the expense of the uninformed consumer.

## V. CLASS ALLEGATIONS

43.     Plaintiff brings this action as a class action under Fed. R. C P. 23 (b)(2) and

(b)(3), on behalf of himself and a class defined as follows:

> All individuals who, anytime from six years prior to the date of the filing
> of this Complaint and while residents of New Jersey, (1) used  PNC's
> debit card banking services, and (2) were subjected to an overdraft charge
> by PNC because of PNC's Debit Ordering policy of high to low reordering
> of debits, which overdraft charge was not reimbursed or re-credited to the
> individuals account.

44.     The class is so numerous as to make it impracticable to bring all members of the

class before the Court.  The exact number of class members is unknown but believed to number

in, at least,  the tens of thousands based on the number of PNC's Customers and reports on the

prevalence and rates of occurrence of overdrafts due to use of high to low debit reordering

practices. PNC has records pertaining to the identity and the number of Customers, in addition to

Mr. Casayuran, that it serves in New Jersey through its 1,525 ATM's and operating branches and

the number of New Jersey bank customers who were charged overdraft fees.

45.     Common questions of law and fact affect the rights of each member of the class

and predominate over individual issues, and a common relief by way of damages and a

declaratory judgment are sought for the class.  Among the predominating common questions of fact and law are:

a)      Whether PNC's practice of re-ordering debits from customer checking accounts from chronological to high to low order to increase the number of Customer overdrafts is unconscionable and violative of N.J.S.A.  56:8-2.

b)      Whether PNC's practice of re-ordering debits from customer checking accounts from chronological to high to low order to increase the number of Customer overdrafts is deceptive and misleading in violation of N.J.S.A.  56:8-2.

c)      Whether PNC's actions in seeking to maximize the amount of overdraft fees allocated to its Customers' accounts by its practice of re-ordering debits from customer checking accounts from chronological to high to low order violated its duty to operate with good faith and fair dealing and thus constituted a breach of contract.

d)      Whether PNC's unjustly enriched itself to the detriment of Plaintiff and the class members by its practice of re-ordering debits from customer checking accounts from chronological to high to low order to increase the number of Customer overdrafts.

46.     Plaintiff's claims are typical of the claims of the class since he was a banking customer of PNC, who used a debit card, and was charged fees under PNC's overdraft policy because PNC re-ordered his debit charges from high to low.  Thus, his claims are aligned with every other member of the Class.  Plaintiff has suffered the same type of ascertainable financial loss under PNC's overdraft policy as other members of the class arising out of PNC's wrongful

conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all class members.

47.     Plaintiff will assure the adequate representation of all members of the class.  He is unaware of any conflicts that compromise his ability to represent the class.  His only relationship to PNC is as a customer.  Plaintiff's interests in this action are antagonistic to the interests of PNC and he will vigorously pursue the claims of the class.

48.     Plaintiff has retained experienced and competent lawyers who are well-versed in complex class action litigation who will fairly and adequately represent the interests of the class. Counsel satisfies all requirements of Fed. R. Civ. P. 23(g).  Specifically, counsel has done extensive work in identifying or investigating potential claims in the action; counsel has extensive experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel has broad knowledge of the applicable law; and counsel has ample resource which they can and will commit to representing the Class.

49.     A class action provides a fair and efficient method of adjudicating this controversy.  The substantive claims of Plaintiff and the class are the same and will require evidentiary proof of the same kind regarding the existence, terms and administration of PNC's overdraft policy, and application of New Jersey law to these transactions of PNC customers in New Jersey.  Since PNC has imposed this unconscionable overdraft policy on, upon information and belief, all of its personal banking customers who have been issued debit cards, declaratory and equitable relief is appropriate with respect to the class.

50.     Class action treatment is also superior to the alternatives for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims, which in amount are modest in amount individually,

14

in a single forum simultaneously, and without the duplication of effort and expense that numerous individual actions would entail. Prosecution of separate actions by individual members of the class would also create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for PNC and its Subsidiaries.

51.     The identities of class members and information required for damages calculations can be determined from PNC's records.

## VI. SUBSTANTIVE COUNTS

### COUNT ONE – NEW JERSEY CONSUMER FRAUD ACT

52.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

53.     The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "any unconscionable commercial practice, deception fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.S.A.  56:8-2.

54.     The conduct of Defendant as set out above constitutes unlawful acts and practices that are prohibited by the NJCFA.

55.     As a result of Defendant's unconscionable commercial practices, misrepresentations, and material omissions  that PNC intended consumers such as he rely upon, Plaintiff and members of the Class have suffered an ascertainable loss of monies and/or value.

56.     Unless PNC's conduct, activities or material omissions are declared illegal and violative of the NJCFA and enjoined, PNC will continue to do the same in the future to the detriment and harm of Plaintiff and others similarly situated.

## COUNT TWO – COMMON LAW UNCONSCIONABILITY

57.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

58.     Plaintiff and Class Members entered into one-sided, standard form contracts drafted by Defendant.  Both the manner in which Defendant PNC drafted and presented the Account Agreement to Plaintiff and Class Members, and thereafter has arbitrarily applied and acted under same, along with the aforementioned circumstances particular to Plaintiff and Class Members, demonstrate the procedural aspects of the Agreement are unconscionable.

59.     Defendant imposed and applied the terms of this Agreement in a way that that is arbitrary, capricious and shocks the conscience.  Plaintiff and Class Members paid disproportionately high fee amounts for relatively small overdraft amounts resulting from Defendant's bad faith manipulation of the posting and reordering of debits.  The language of the Agreement and the way in which Defendant applied the language render it, therefore, substantively unconscionable.

60.     As a result of Defendant's actions, Plaintiff and members of the Class have suffered an ascertainable loss of monies and/ or value.

## COUNT THREE– BREACH OF CONTRACT

61.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

62.     The Account Agreement for Personal Checking, Savings and Money Market Accounts (hereinafter "Account Agreement") entered into between Defendant Bank and Plaintiffs and other member of the Class constitutes a contract.

63.     Plaintiffs and other Class members performed their end of the bargain, or they were excused from nonperformance by Defendant's misconduct set forth herein.

64.     Under New Jersey law, a duty of good faith and fair dealing is an implied obligation applicable to every contract without regard to context.  Good faith in contracting is the obligation to observe the spirit of the bargain, rather than merely the letter.  Evasion of the spirit of the bargain under the pretext of acting under the letter of the agreement and the abuse of the drafter's power to specify terms have been judicially recognized as examples of bad faith in the performance of contracts.

65.     When an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of making that determination in good faith is fairly implied under the law.  Here, under the account terms and conditions it has created, Defendant may unilaterally choose, and has chosen,  to impose overdraft charges by posting transactions in any order Defendant wishes, and by unilaterally deciding whether to honor debit transactions when consumers have insufficient funds.

66.     PNC breached its Account Agreement with Plaintiffs and Class members by arbitrarily and unnecessarily, imposing on them avoidable overdraft fees that were caused by the manner in which Defendant  reordered debits from high to low, resulting in more, and at times, multiple, unnecessary avoidable overdrafts.

67.     In breach of its contracts with the Plaintiff and class members, Defendant has asserted excessive, unreasonable and unnecessary numbers of overdraft charges, which were neither set nor assessed in accordance with the reasonable expectations of the parties.

68.     Because the occurrence, amount and frequency of overdraft charges are set unilaterally and arbitrarily by the Defendant, Defendant has an obligation to impose those overdraft charges in good faith, but has breached this obligation by intentionally manipulating, delaying and rearranging the posting of transactions to accounts in order to maximize the amount of charges.

69.     Plaintiff seeks a judicial declaration that the charges set by Defendant are inconsistent with the terms of its contracts with the Plaintiff and the class members, an order enjoining it from further acting in such manner that is inconsistent with the terms of its contracts with the Plaintiff and the class members, and further seeks restitution or compensatory damages resulting from Defendant's breach of contract as the Court deems fit and just.

## COUNT FOUR –UNJUST ENRICHMENT

70.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.  This claim is pled in the alternative.

71.     As a result of the unlawful and unconscionable practices of the Defendant as described in the preceding paragraphs, the Defendant has obtained and retained significant monies to which it has no lawful claim, and has accordingly been unjustly enriched as a result.

72.     Through resort to its various practices described herein, Defendant received a non-gratuitous benefit, and retention of that benefit without disgorgement of its ill-gotten profits would be unjust.

73.     The Plaintiff and the class members reasonably expected that the Defendant would only charge overdraft fees when commercially reasonable and fair to do so, and as Defendant has

18

acted beyond the bounds of commercial reasonableness and fairness, Defendant has been unjustly enriched beyond the bounds of its contractual rights.

74.      Plaintiff seeks disgorgement of all unjustly retained profits which have been obtained through Defendant's unfair, unlawful, misleading and deceptive means described with particularity in the forgoing paragraphs of this Complaint.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the class, prays for the following relief:

A.  Determine that the claims alleged may be maintained as a class action, appoint Plaintiff as representative of the Class; appoint undersigned counsel as Class Counsel,  and issue an order certifying the Class as defined above;

B.  Award all actual, general, special, incidental, statutory, punitive and consequential relief, restitution and damages to which Plaintiff and the Class are entitled;

C.  Award pre-judgment and post-judgment interest on such monetary relief;

D.  Grant appropriate injunctive and/or declaratory relief as the Court may deem reasonable and appropriate under the circumstances,

E.  Award reasonable attorney's fees and costs, and grant such further and other relief this Court deems appropriate and as allowed by law.

F.  Award such other relief as may be available and just under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues raised by this Complaint that are so triable.

Dated:  October 8, 2009                    Respectfully submitted,

Michael Coren, Esq.
Andrew  L.Watson, Esq.
PELLETTIERI, RABSTEIN AND ALTMAN
100 Nassau Park Boulevard
Suite 111
Princeton, New Jersey 08540
(609) 520-0900
mcoren@pralaw.com
awatson@pralaw.com
Attorneys for Plaintiff and the proposed class

*Of counsel*:

Edward J. Feinstein, Esq.*
Ellen M. Doyle, Esq.*
Stember Feinstein Doyle & Payne, LLC
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA 15219-1639
(412) 281-8400
efeinstein@stemberfeinstein.com
edoyle@stemberfeinstein.com

* Admission pro hac vice will be requested

# Account Agreement for Personal Checking, Savings and Money Market Accounts

**Welcome**
We have prepared this Agreement to define the relationship between you and the Bank. Please read this Agreement and keep it for future reference.

You should also refer to certain other documents for terms and conditions relating to your Account, including PNC Bank's:
(i)   Consumer Schedule of Service Charges and Fees;
(ii)  Funds Availability Policy;
(iii) Substitute Check Policy Disclosure;
(iv)  Consumer Electronic Funds Transfer Disclosure Statement; and,
(v)   PNC Bank Online Banking and Bill Pay, Online Banking Transfer Funds and PNC Payment Services, and/or Online Bill Pay Services Agreement for information concerning the use of these services (if you have selected any of these services);
(vi)  Overdraft Protection Agreement; and
(vii) The PNC Financial Services Group, Inc. Consumer Information Privacy Principles.

By signing the signature card and/or Account Registration, by using the account, by requesting or later adding products and/or services connected to the account, you agree to be bound by the terms and conditions of this Agreement, or in the case of additional account related products and/or services, the applicable terms and conditions. If there is a conflict between this Agreement and something said by an employee or officer of the Bank, this Agreement will be followed. The legal representative of any Account owner, including any attorney-in-fact you may appoint, shall also be subject to the terms and conditions of this Agreement.

**Accounts**
All PNC Bank checking, savings and money market accounts are subject to this Account Agreement, including the products currently listed in the Consumer Schedule of Service Charges and Fees. You agree to use your Account only for personal, family or household purposes and not for business or other non-personal purposes. You also agree to carefully check each transaction as you conduct or receive notice of it, whether in our branches, over the telephone, through your personal computer, at automated teller machines (ATMs), at point-of-sale terminals, or by receipt of mail or statements, and to take every precaution to safeguard your checks, withdrawal tickets, Banking Card, Check Card, or any Personal Identification Number (PIN) against loss or theft. You must notify us immediately if they are lost or stolen.

**Information**
We will treat personal information about you and your account in accordance with The PNC Financial Services Group, Inc. Consumer Information Privacy Principles. You agree to cooperate with us in any record keeping and reporting which we believe to be necessary to fulfill government requirements.

**Non-Return of Checks**
Unless you have otherwise arranged, we will not return to you checks that have been paid against your account. At your request we shall provide you with photocopies or image copies of checks paid against the Account or other Account documentation, if such checks or documents are available to us under our record retention policies, and subject to the charges set forth in our Consumer Schedule of Service Charges and Fees.

Exhibit 1

**PNC BANK**
LEADING THE WAY

**Deposits**

You may deposit any amount of money you wish into your Account at any branch during our normal business hours. Please use the deposit slips we have provided for you. This is your best assurance that the deposit will be promptly credited to your Account. In addition, for all Accounts, deposits may be made, if permitted by law and our operating procedures, by telephone transfer, personal computer transfers, at an ATM, by mail, through direct deposit of your recurring deposits, such as social security benefits and salary, or by automatic transfers from other accounts with us or other financial institutions. We may refuse to cash a check made payable to you, but instead require you to deposit the check to your Account.

All deposits are accepted by us subject to verification. You should retain your copy of the receipt and any other document which evidences your deposit. If you claim that a deposit was not properly credited to your Account, we may ask you to show us your receipt. You should not mail cash deposits. We will not be responsible for any deposit which we do not receive, and our records will be conclusive proof of receipt or non-receipt of a deposit. We reserve the right to make adjustments to your Account for computational or other errors related to your Account. You agree that we will not be liable to you if we return an item you have deposited after the time requirement set by applicable law, if our delay is due to markings that you or a prior endorser have made on the back of the item in the space reserved for our endorsement.

All non-cash deposits are posted to your Account subject to our receipt of final payment. If we receive notice that an item is being returned to us unpaid or if final payment is not received, or if an item is returned after final payment, we will charge your Account for the amount of those deposits, for any interest earned on those deposits and for our return of deposited item charge as well, even if those deposits have already been made available to you. If this charge creates an overdraft, you agree to pay us the amount of the overdraft immediately and we will charge your Account a service charge for the overdraft.

We receive final payment for deposit items at different times depending on the location of the banks or other parties who will pay the items. In addition, our receipt of final payment may be further delayed due to circumstances beyond our reasonable control.

If we must pay any fees to collect your deposit, including attorney's fees that we may incur, we will charge them to your Account and we may impose a service charge for the collection. We reserve the right to refuse or return all or part of a deposit at any time. We will have no obligation to provide you with notice of any nonpayment, dishonor, or protest regarding any items credited to or charged against your Account.

In addition to any other rights we have under this Agreement, if we are required to reimburse the United States government any portion of a benefit payment deposited into your Account, you agree that we may deduct the amount returned to the government from your Account or any other account you have with us without prior notice to you, unless such a deduction is prohibited by law.

You acknowledge and agree that your deposit or issuance of a check that uses check stock or forms with decorative images, or that has ink colors other than black or blue, may result in errors in processing a check image created from such a check. You agree that, to the extent permitted by law, we shall have no liability to you in the event that you incur a loss from such errors.

You agree that you shall not deposit, without our prior written consent, a document that you created or printed from an image or other electronic record of an original paper check (a "substitute check document"). Our acceptance for deposit of a substitute check document from you shall not be



**PNC BANK**
**LEADING THE WAY**

deemed as a waiver of the foregoing prohibition on the deposit of substitute check documents. You also shall not identify us as a "reconverting bank" or "truncating bank" on a substitute check document you deposit at any other financial institution or transfer to any other person. You hereby agree to indemnify us for any loss that we incur directly or indirectly from your deposit or transfer of a substitute check document in violation of the limitations set forth in this paragraph.

**Notice and Crediting of Certain Electronic Credits**
If you receive a credit to your Account through the Automated Clearing House (ACH) network, the rules of the National Automated Clearing House Association do not require us to give you next day notice. Instead, we will notify you of the credit on your regular Account statement.

If we credit your Account for an ACH credit entry or for any other fund transfer or payment order ("fund transfer"), the credit we give you is provisional until we receive final settlement for the fund transfer through a Federal Reserve Bank. If we do not receive final settlement or payment, you agree that you must refund to us the amount we credited to you for the fund transfer and that we may charge your Account for such amount.

When we process incoming fund transfers, we routinely rely on the account number given to us by the financial institutions or other persons who send the fund transfers to us. We will have no duty to determine if the account number provided to us is consistent with the name or other information given to us and we will not be liable to you if we credit a fund transfer intended for you to another customer's account because the sender instructed us to credit an incorrect account number.

**Withdrawals**
You may withdraw money from your Account in different ways, as permitted for each type of Account.

If you make withdrawals by check, the check must be properly completed and signed by you or your representative whose authority is on file with us. If your account is a joint account, we may honor a check that is signed by any joint account owner.

Your account may be debited on the day an item is presented by electronic or other means, or at an earlier time based on notification received by us that an item drawn on your account has been deposited for collection in another financial institution. We are required to permit a withdrawal only if you have sufficient available funds in your Account to cover the whole amount of the withdrawal. A determination of your account balance for purposes of making a decision to dishonor an item for insufficiency of available funds may be made at any time between the receipt of such presentment or notice and the time of payment or return of the item or debit, and no more than one such determination need be made.

Effective September 19, 2008, in determining whether you have sufficient funds in your account to cover a withdrawal, PNC Bank will consider: (1) the deposits and withdrawals posted that day to your account, and (2) all pending electronic transactions for which PNC has received notice, even if those transactions have not been presented to PNC for payment. Such transactions include (but are not limited to) purchases, transfers or withdrawals made with your Check Card or Banking Card, merchant payment authorizations, online transfers of funds, telephone transfers, and any other electronic transactions or transfers. We may conclusively rely on notice of electronic transactions in determining whether you have sufficient funds in your account to cover a withdrawal even if the notice incorrectly describes the transaction. This could result in an overdraft if sufficient funds are not available in your account to cover all withdrawals. We will not be responsible for damages or wrongful dishonor if any item is not paid because of insufficient funds resulting from this method of



**PNC BANK**
**LEADING THE WAY**

determining whether you have sufficient funds to cover a withdrawal. In addition, funds you may have deposited may not be immediately available under our Funds Availability Policy. Please review our Funds Availability Policy for more information.

Checks, debits such as ATM withdrawals, debit card transactions, preauthorized automatic debits, telephone-initiated transfers, other electronic transfers, other types of debits or other withdrawal orders that exceed the available balance in your account (that create an overdraft) are subject to a service charge. If there are sufficient funds to cover some but not all of your withdrawal orders, we will exercise our discretion (i) in paying some but not all of the items, and (ii) to pay the items in any order. In exercising that discretion to pay in any order, we do not necessarily process items in the order in which we receive them. Our general practice is to post withdrawals from your account in order of the largest-to-smallest dollar item; in other words, beginning with the largest dollar item, then the next-largest dollar item, and so on until we reach the last, smallest-dollar item. The order in which we process these withdrawals may affect the total amount of overdraft fees charged to your Account. If, in our sole discretion, we choose to allow withdrawals for which there are not sufficient available funds, you agree to repay us immediately the amount of the funds advanced to you. We may also assess your Account a service charge. At no time shall we be required to allow you to overdraw your Account even if we had allowed such activity on one or more prior occasions. We reserve the right to refuse to cash or to impose a charge on anyone who asks us to cash a check that you have written. Even if your check is otherwise properly payable, we will not be liable to you for dishonor of your check, or otherwise, as a result of such refusal.

You agree that we do not have to notify you when we refuse to pay a check you have written, or if we pay a check which overdraws your Account, or when we impose a fee in connection with either of these events.

If you have an interest bearing Account, we reserve the right to require that you give us notice in writing of an intended withdrawal from your Account not less than 7 days before such withdrawal is to be made, in accordance with federal regulations. If we permit you to make withdrawals without giving us notice, we may still require you to give us notice at a later time.

In writing checks, we strongly suggest that you date them with a current date. We will not have liability to you for paying checks which are postdated, stale dated or do not bear a date. If you do not wish us to pay a check you have issued, you should place a stop payment order with us. Please refer to the Stop Payment section of the Agreement.

You will only use forms supplied or approved by us in writing checks. Our duty is to use ordinary care in examining checks when they are presented to us for payment. Unless we have specifically agreed with you in writing, our duties will not include monitoring nonstandard instructions or other legends appearing on checks. We shall be deemed to have exercised ordinary care as to your signature if we process your check only by automated means (so as to clear the largest number of checks at the lowest cost to customers) or if any unauthorized signature or alteration is so skillfully made that a reasonably careful person would not readily detect it. Use by any person of your facsimile stamp or machine shall be considered an authorized signature.

**Transaction Limitations**
For Savings Accounts, you may make unlimited withdrawals or transfers by mail, ATM (if we have permitted you to access such account with your card) or in person; you may, however, make no more than a total of six transfers to other accounts or to third parties during each month when these are made by preauthorized or automatic agreement or telephone transfer, and no more than three of the six transfers may be made by use of a debit card or similar order payable to a third person.


**PNC BANK**
LEADING THE WAY

For money market accounts, you may make unlimited withdrawals or transfers by mail, ATM or in person; you may, however, make no more than a total of six transfers to other accounts or to third parties during each monthly statement period when these are made by preauthorized or automatic agreement or telephone transfer, and no more than three of the six transfers may be made by check, debit card or similar order payable to a third person.

We reserve the right to prevent transfers which exceed the above limits or to monitor these transactions after they occur. Where we observe that the number of transactions exceeds the above limits, we will contact you for corrective action. Where excessive transactions continue to occur, or where the number of transactions shows little attempt to stay within the limitations, we reserve the right to close the Account or convert it to an Account without transfer limitations. For more precise information as to which types of transactions may be conducted with each Account, and any limitations on such transactions, please refer to our Electronic Fund Transfer Disclosure Statement or ask a Bank employee for assistance.

### Features of Certain Accounts

Checking accounts consist of two sub-accounts - a checking sub-account and a non-interest bearing money market sub-account. Interest Checking accounts consist of a checking subaccount and a money market sub-account, which each earn interest at the Interest Checking rate.

Each statement period, we allocate funds between these two sub-accounts and make transfers each day from the available funds in the money market sub-account to the checking sub-account as needed to pay withdrawals. We reserve the right to require at least seven days written notice prior to the withdrawal or transfer of any funds from a money market sub-account. On the sixth transfer in a statement period, the entire balance in the money market sub-account is transferred to the checking sub-account for the remainder of that statement period.

### Stop Payment

You may stop payment on any check, telephone, pre-authorized transfer or Visa Check Card recurring debits, except for Cashier's Checks, money orders, or other cash equivalent items. Stop payment procedures for pre-authorized transfer orders are explained in our Electronic Funds Transfer Disclosure Statement. In order for your stop payment order on a check or other item to be considered timely, we must receive your order at a time and in a manner that gives us a reasonable opportunity to act on it prior to payment. A written or oral stop payment order is effective for six (6) months from the date of receipt by us, unless you notify us in writing to cancel the stop payment order sooner. Stop payment orders on Visa check card recurring debits are effective for two (2) years from the date of receipt. For any stop payment order to be effective, at least one (1) transaction must have previously posted. If you wish to extend a stop payment order for an additional period, you must call us or write to us prior to the expiration of the original stop payment period. If your stop payment order is not extended, we may pay any check that is presented to us after your original stop payment order has expired.

We will accept stop payment orders from any person with signing authority on your Account, regardless of who wrote the check or gave the other withdrawal order. Stop payment orders are subject to our current charge for that service. You may place a stop payment order by calling or stopping by any branch, or by calling us at the number, or writing to us at the address, shown on your periodic statement.

We will request the following information about the check or other withdrawal order to be stopped:

> Account number      > Amount
> Check number        > Name of party to be paid
> Date                > Your name and address



Stop payment orders are processed by computer. Unless the amount of the check (or other transfer or withdrawal order) and other information are reported absolutely accurately, we cannot assure you that the item you want stopped will not be paid.

In the event that we inadvertently pay an item over your valid stop payment order, we may refuse to recredit your Account if you owed the money to the payee(s). If we recredit your Account, you shall be deemed to have assigned to us all of your rights against the payee(s), both on the item and on the underlying claim.

**Use of Check Images and Substitute Checks**
For each original check that you deposit, you hereby authorize us (and any collecting bank, returning bank, Reserve Bank or processor which subsequently receives the original check) to create an electronic image ("check image") of the original check, and to process that check image for collection, payment and return. You further authorize the destruction of the original check that has been imaged. We may in our sole discretion determine the manner in which to collect or return a check image. We may: (i) present or transfer the check image to the paying bank, a Federal Reserve Bank, a check clearing house, image exchange network, or other collecting bank or returning bank; or (ii) create a substitute check and collect such substitute check (governed by the Check Collection for the 21st Century Act referred to here as the "Check 21 Act") instead of the check image.

A check image or a substitute check may be collected through one or more check clearinghouses, one or more Federal Reserve Banks, or pursuant to an exchange agreement with another depository institution. In such cases, you agree that the check image or substitute check is subject to the rules of that clearinghouse, Federal Reserve Bank, or exchange agreement.

You agree that we may debit your Account for any of the following items: (i) a check image of an original check drawn on your Account and presented for payment or collection, or (ii) a returned check image of an original check that was deposited by you. In these situations, we may debit your Account without receipt of, or review of, the original check associated with the check image. In our sole discretion, we may return to a presenting bank, returning bank or paying bank or post to your Account, a paper copy or paper representation of an original check (including without limitation an image replacement document or IRD, or a photocopy) drawn on or returned to your Account that does not otherwise meet the technical or legal requirements for a substitute check.

You agree that a check image that is received or created by the Bank in the check deposit, collection or return process shall be considered a "check" and/or an "item" for all purposes under this Agreement and applicable law.

In addition, a check that you deposit with us, or that you draw on your Account, may be truncated in the check collection process and replaced with a substitute check. You authorize us to pay, process or return a substitute check in the same manner as "check" or "item" under this Agreement. Substitute checks are governed under the Check 21 Act and the terms of this Agreement, to the extent not modified by the Check 21 Act.

You agree to indemnify and hold harmless us, our employees and agents from any loss, claim, damage or expense that you or any other person may incur directly or indirectly as a result of any action taken by us to process a check image or substitute check instead of the original check, including the destruction of the original check, as described above, to the extent permitted by applicable law.



**Remotely Created Checks**
If you deposit a "remotely created check" with us, you represent and warrant to us that the check is authorized to be paid in the amount stated on the check and to the payee named on the check. A "remotely created check" is a check that you are authorized to create and present for payment by an authorized signer on the account on which the check is drawn, and which does not bear the signature of an authorized signer on that account, and includes checks that are defined in applicable law as "remotely created checks". In addition to the foregoing, we may honor "remotely created checks" authorized in the amount stated on the check and to the payee named on the check, by you or a joint owner of your account.

You agree to indemnify us for any loss that we may incur directly or indirectly from your deposit of a "remotely create check" in violation of the terms set forth in this paragraph. You further agree that all of the terms in this Agreement and under applicable law that apply to a "check" and/or "item" apply to "remotely created checks", including without limitation substitute checks created from "remotely created checks" and check images of "remotely created checks", except that" remotely created checks" will not be signed by an authorized signer on the account on which the check is drawn.

**Interest**
Interest will be calculated on your interest bearing Account and credited directly to your Account as stated in the section titled, Interest Payment and Balance Computation. Your interest rate and annual percentage yield may change. At our discretion, we may change the interest rate on your Account at any time without notice to you. If you desire current interest rate and annual percentage yield information, please call or visit any branch in your market.

We reserve the right to calculate interest for those interest bearing Accounts which are used for personal, family or household purposes in a manner different from those interest bearing Accounts which are used for business or other non-personal purposes.

We must report interest on your Account to the appropriate governmental agencies. It is your responsibility to give us your correct social security number and/or to make certain written certifications to us as required by federal law. If you fail to give us your number and/or the required certifications, we may withhold and pay to the government a percentage of the interest earned on your Account, as required by law. You may also be subject to government penalties.

**Statements**
We will make available or send a monthly statement (whether in paper form, or if authorized by you, in electronic form) to the last address (whether postal or email) which you have specified for your Account. For Savings Accounts, we will send this statement quarterly and for any month in which an electronic fund transfer has occurred. This statement will list all activity which relates to your Account during the statement period and any other information required by law. Upon receipt, you should review your statement carefully. If you fail to notify us of any problem which appears on the statement, within 30 days of receipt of the statement, you will lose certain legal rights. Notwithstanding the foregoing, the time period for notifying us or making a claim under the Check 21 Act, with respect to a substitute check or an image of a substitute check that is sent with a statement or that appears on a statement, will be as set forth in the Check 21 Act.

We reserve the right to reduce the frequency with which we send you a periodic statement if your Account becomes inactive, as discussed later in this Agreement.

Please notify us of any change in your address. If your statement is returned to us, we may suspend further mailings until a current address is received. You can notify us of an address change by mail, in person, or through our Online Banking system.



**PNC BANK**
**LEADING THE WAY**

**Joint Accounts**
If your Account is a joint Account, then you own your Account as joint tenants with the right of survivorship and not as tenants in common. Unless we have received other specific directions signed by all joint depositors, each joint depositor appoints the other joint depositor(s) as attorney(s)-in- fact, so that any joint depositor may endorse checks, drafts or other instruments payable to any joint depositor, may make deposits to or withdrawals from your Account and may give us instructions concerning the Account; this initial appointment shall continue despite the later disability, incapacity or death of any joint depositor. Each joint depositor may also appoint his own attorney-in-fact to transact business on the joint Account, without the knowledge or consent of the other joint depositor(s).

To be considered a joint depositor, you must have signed the signature card for the Account. Notice provided by us to any one joint owner shall be considered notice to all joint owners. If we receive notice of a dispute between two or more joint depositors, we may require the signatures of all joint depositors for all transactions until the dispute is resolved to our satisfaction.

If this is a joint Account and we are served with legal process affecting the funds in the Account, we may take any action permitted or required by law, pending resolution of the matter. Upon the death of any joint depositor, the balance in the Account shall be owned by the surviving joint depositor(s).

**Fiduciary or Agency Accounts**
Any individual acting as an attorney-in-fact, agent, guardian, personal representative, trustee, custodian, or some other fiduciary capacity (collectively, an "agent") must be designated by us as such on our records. If this individual is not so designated, it will be assumed by us that you have no agent appointed.

The Bank is authorized to follow the directions of your agent regarding your Account until it receives written notice that the agency or fiduciary relationship has been terminated and has had reasonable time to act upon that notice. We will not be liable to you in any way if your agent misapplies any of the funds from your Account. We have the right to review and retain a copy of any power of attorney, agency agreement, trust agreement, court order, or other document that has established the agency or other fiduciary relationship.

**Payable-On-Death Accounts**
We will, to the extent permitted by law, accept accounts that are designated as payable on death accounts and which automatically transfer your account to the beneficiaries designated on the signature card upon your death.

**Accounts Under the Uniform Transfers to Minors Act or the Uniform Gifts to Minors Act**
The custodian of any account under either the Uniform Transfer to Minors Act or the Uniform Gift to Minors Act must notify us immediately in writing upon either the death of the minor or the minor reaching the age of majority. Upon such notice, the custodian's authority over the Account will continue only to the extent allowed by applicable law. Until such notice is received, we may honor any checks or drafts written on the Account without incurring any liability to either the minor or any third party, and the custodian will be liable to us for any loss or expense we incur as a result of the failure to give us notice.

Upon the death, incapacity or resignation of any custodian, and there is no remaining custodian in those jurisdictions that permit joint custodians, we will recognize a successor custodian duly designated by the previous custodian. If no successor custodian has been so designated, we will only recognize a successor custodian who is assuming the position in accordance with applicable state law.



**PNC BANK**
LEADING THE WAY

**Death of Depositor**

Following the death of a depositor, the amount credited to the Account shall be payable in accordance with applicable law. This includes our right to pay any checks and to carry out any transfer orders authorized by the deceased depositor for a period of 10 days (or as otherwise provided under applicable law) after the date of death, unless we receive instructions to stop payment on those orders from a surviving joint depositor, in the case of a joint Account, or the legal representative of the deceased depositor, in the case of a single Account.

Each joint depositor agrees to notify us upon the death of any other depositor. We reserve the right to refuse withdrawals from your Account until any legal requirements are complied with.

**Inactive Accounts**

If your Account is inactive as defined by law and you have not otherwise communicated with us about your Account for the period provided by law, we will be required to transfer the balance of your Account to the state, as abandoned property. If your Account is inactive for the period of time specified in our Consumer Schedule of Service Charges and Fees, your Account will remain subject to all applicable service charges and fees, and we reserve the right to impose a nonrefundable inactivity charge on your Account. You also agree that if your Account becomes inactive, it will be subject to any new charges or fees or increases in charges or fees which go into effect during the period of inactivity, and that we may reduce the frequency with which we send you a periodic statement for your Account.

**Money Owed**

Any loans, overdrafts, obligations or other indebtedness (except for debts arising out of bank credit cards or IRA or other tax-deferred retirement accounts, unless permitted by applicable law) now or hereafter owing to us by you, either individually or jointly, including husband and wife, may be charged in whole or in part to the Account or to any other individual or joint accounts in your name to the extent permitted by law. If you receive payment from us for an item, you agree that we may place a hold on your Account in order to investigate a claim that the item contains a forged endorsement or alteration. If, after a reasonable investigation, we find that the item contains a forged endorsement or alteration, we may charge your Account for the face value of the item.

You and any joint depositors grant us a security interest in the balance in the Account and in any other individual and joint accounts in your name, including joint accounts owned by husband and wife, to pay all loans, overdrafts or other obligations or other indebtedness now or hereafter owing to us by you, either individually or jointly.

We may exercise our right of set off without advance notice to you and without regard to any other right which we may have against you or any other person or entity. We may also freeze or place a hold on your account without setting off in order to investigate any dispute or claim.

Our security interest and right of set off shall prevail and take priority over any claim, change of ownership, pledge, attachment, garnishment, levy, court order or other legal process of any kind whatsoever. Should one of these events occur, we may take any action permitted or required by law.

**Disputes Involving Your Account**

You agree to be liable to us for any loss, costs, or expenses, including reasonable attorney's fees, that we may incur as a result of any dispute involving your Account. You authorize us to deduct any such loss, costs or expenses from your Account without prior notice to you. This obligation includes disputes between you and us involving the Account and situations where we become involved in disputes between you and an authorized signor, another joint owner, or a third party claiming an



**PNC BANK**
**LEADING THE WAY**

interest in the Account. Also, it includes those situations where you, an authorized signor, another joint owner, or a third party take some action with respect to the Account which causes us to seek the advice of counsel, even though we do not actually become involved in the dispute.

## Account Security
If you wish to report any irregularity with respect to your Account, you should contact us immediately at the number shown on your statement or at any branch. We may require you to close your Account or transfer the balance to another account to prevent security risks, at our discretion.

## Transfer of Ownership
Your account is not transferable except on our records. We must approve any pledge of your Account as security for a debt, and any pledge remains subject to our security interest and right of set off, unless we otherwise agree in writing. If you wish to transfer ownership of your Account, or delete an owner from a joint Account, we may require that your Account be closed and a new one be opened by and in the name of the new owner(s).

## Charges
Your Account may be subject to various charges, including a monthly service charge, item charges and charges for the use of certain Account services, including electronic services. Please be aware that these charges reduce your Account balance and may cause you to become overdrawn or your outstanding checks to be returned unpaid.

If funds in your Account are attached, garnished, or levied against, or if we are prohibited by law from paying on your Account, we may assess a legal process charge. Any such charge will reduce your Account balance and may cause your outstanding checks to be returned unpaid.

All charges and other fees mentioned in this Agreement or otherwise applicable to your Account are detailed in our Consumer Schedule of Service Charges and Fees, a copy of which has been given to you, and which is a part of this Agreement.

## Amendment, Waiver
We reserve the right to amend this Agreement (including the right to convert your Account from one product to another) and our Consumer Schedule of Service Charges and Fees (including the right to change charges, fees, and the manner in which we calculate and/or credit interest), from time to time. Unless such change is favorable to you or is required by an emergency situation (in which case we shall give you such notice as we may deem practicable), an amendment will become effective 30 days (or such later time if required by law) after notice of the amendment is posted in our branches, or by such other method of notice as we may deem appropriate or as may be specifically required by applicable law. If this is a joint Account, then notice of an amendment provided to one joint depositor shall be deemed to be notice to all joint depositors.

We reserve the right to waive the enforcement of any of the terms and conditions of this Agreement. Any such waiver must be in writing and signed by a Bank officer and shall not be considered a waiver of any other or future obligation or right.

## Notices
Any written notice that you give to us is effective when we have actually received it. Any written notice that we give to you is effective when it is deposited in the United States mail and will be sent to your last known address which appears on our records.



**Severability**
In the event that any paragraph of this Agreement or any portion thereof is held by a court to be invalid or unenforceable for any reason, the other paragraphs and portions of this Agreement not held by the court to be invalid or unenforceable will continue in full force and effect.

**Endorsements**
The law allows the Bank to supply a missing endorsement to a deposited check, draft, or any other instrument. However, we reserve the right to refuse to accept for deposit any item which does not bear a proper endorsement, which is payable to someone other than you or under any other circumstances in our sole discretion. If an item that does not bear, or does not appear to bear, a proper endorsement is deposited into your account, you agree that we may place a hold on your account while we investigate or until we obtain all necessary endorsements. Federal law specifies locations on checks for your and our respective endorsements. If our endorsement is illegible because you have endorsed the check in the wrong location, you will be liable for any resulting losses.

**Debit Cards**
If we issue debit cards to you for conducting transactions at ATMs, or purchasing goods or services from merchants, you agree that such cards are our property, may be canceled at any time without notice to you and will be surrendered upon our request. You acknowledge that the personal identification number (PIN) assigned has the same legal effect as your signature and is personal and confidential. You agree to take all reasonable precautions so that no one else learns the PIN, including not telling or disclosing the PIN to any other person, not writing the PIN on your debit cards, and not keeping a record of your PIN in the same wallet or place as your bank cards. You agree that if you give your debit card and PIN to another person to use, you will be responsible for the use of that card by such person. You agree to report to us any loss or theft of debit cards or any other problem concerning your Account. Your rights and liability will be as set forth in the Electronic Funds Transfer Disclosure Statement in this booklet.

**Closing the Account**
You or the Bank can close your Account and terminate this Agreement at any time and for any reason, by providing notice in writing. If we close the Account, we will mail you a check for the final balance. If you close the Account, you will still be liable to us for any service charges or overdrafts which may occur before, during or after the Account is closed, and for any items that are outstanding at the time you close the Account.

**Governing Law**
This Agreement is governed by the laws and regulations of the state in which the branch where you opened your account is located. If your account is opened by mail, or electronically through our internet website, and we have a branch in your state of residence, this Agreement is governed by the laws and regulations of that state. If we do not have a branch located in your state of residence, and your account is opened by mail, or electronically through our internet website, this Agreement is governed by the laws and regulations of the Commonwealth of Pennsylvania. This Agreement is also at all times governed by the laws and regulations of the United States of America.

**Disclosures**
In connection with your Account, we may give you certain disclosure statements or policies, and may revise them from time to time. All such statements, policies and revisions shall be considered to be a part of this Agreement.

**Other Services**
If you use other services (for example, Online Banking, direct deposit, ATM, etc.), in connection with



**PNC BANK**
LEADING THE WAY

your Account, and there is any inconsistency between the terms and conditions of the agreement for those services and this Agreement, then the terms and conditions stated in the agreement for the additional services shall control, but only to the extent necessary.

## INTEREST PAYMENT AND BALANCE COMPUTATION

Your interest rate and Annual Percentage Yield may change. At our discretion, we may change the interest rate(s) and Annual Percentage Yield(s) on your account at any time without notice to you.

Interest on all consumer interest-bearing checking, savings and money market deposit accounts is compounded monthly and credited on the last day of each monthly statement cycle. For Savings accounts with quarterly statements, interest is credited on the last day of each calendar month. If you close your account before interest is credited, you will not receive the accrued interest. Excludes Passbook savings accounts.

We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the total principal in the account each day. Tiered-rate accounts earn interest on the entire account balance each day at the interest rate and annual percentage yield in effect for that day's balance on the highest tier the balance reaches. Interest begins to accrue no later than the business day we receive credit for the deposit of checks and other non-cash items.

Unless stated otherwise, the term "month" means monthly statement cycle.

If you use the combined average monthly balances in your qualifying checking account(s) to avoid the monthly service charge on a Performance Select Checking account, then on the statement date of your Performance Select Checking account, we review the average monthly balance for each related account for the current statement cycle.

The average monthly balance is calculated by adding the principal in each of your related accounts for each day of the month and dividing that figure by the number of days in the month.

## SUBSTITUTE CHECK POLICY DISCLOSURE

### SUBSTITUTE CHECKS AND YOUR RIGHTS
### (IMPORTANT INFORMATION ABOUT CONSUMER CHECKING AND MONEY MARKET ACCOUNTS)

**What is a substitute check?**
To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

**What are my rights regarding substitute checks?**
In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more



**PNC BANK**
LEADING THE WAY

than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

**How do I make a claim for a refund?**
If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us:
> By phone at 1-888-PNC-BANK (1-888-762-2265) or, at 1-800-531-1648 (TT)
> Write us at: PNC Bank/Adjustments, P7-PFSC-02-C, 500 First Avenue, Pittsburgh PA 15219
> Or email us at www.pnc.com. Simply log on to Online Banking (user ID and password, necessary) and select Message Center to send us a secure message

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances. If you tell us orally, we may require that you send us your claim in writing within 10 business days.

Your claim must include:
> A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
> An estimate of the amount of your loss;
> An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
> A copy of the substitute check or the following information to help us identify the substitute check: account number, check number, amount of the check, date the check was paid or posted to your account, the reference number for the check (if known), name of the person to whom you wrote the check, and any other pertinent information.



**PNC BANK**
LEADING THE WAY

## CONSUMER ELECTRONIC FUNDS TRANSFER DISCLOSURE STATEMENT

This Consumer Electronic Funds Transfer Disclosure Statement contains PNC Bank's Consumer Electronic Banking Agreement ("Agreement"). This Agreement provides the terms and conditions that govern electronic funds transfers for personal accounts opened at PNC Bank.

### Consumer Electronic Banking Agreement

The following terms, conditions and disclosures are made to you to explain electronic banking at PNC Bank. They govern all consumer electronic banking transfers, including those made by use of your PNC Banking Card, PNC Bank Check Card, or PNC Wealth Management Banking Card, if you have one, as well as through PNC Bank Online Banking or Online Banking through Quicken®, if you have selected any of these services. Some examples are:

(i)   transactions at automated teller machines ("ATMs"),
(ii)  purchases from merchants made by using your card,
(iii) transferring funds or paying bills through Online Banking and Bill Pay and/or Online Banking
      through Quicken®
(iv)  Automated Clearing House (ACH) transfers
(v)   Electronic Check conversions
(vi)  any other fund transfers to or from your account(s) that you pre-authorize, such as direct deposits
      and automatic payments to or from your account(s), if such transfers are made electronically.

You should also refer to certain other documents for terms and conditions relating to your account(s), including:

(i)   the Account Agreement for Personal Checking and Savings Accounts ("Account Agreement") for
      general rules and regulations;
(ii)  the PNC Bank Online Banking through Quicken®, Online Banking Transfer Funds and PNC
      Payment Services, and/or Online Bill Pay Services Agreement for information concerning use of
      these services (if you have selected any of these services);
(iii) the Consumer Schedule of Service Charges and Fees for information related to charges for these
      services or the right to use these services;
(iv)  the Consumer Funds Availability Policy for information concerning the availability for withdrawal
      of deposits that have been made by electronic or other method to your PNC Bank account(s); and
(v)   the Telephone Transfer Authorization Agreement terms and conditions for information concerning
      use of that service (if you have selected this service).

### Definitions

In this Agreement, several words are used repeatedly, and have the following meanings:

(i)    "account" or "accounts" will mean each of your personal checking or savings accounts which
       you have arranged with us to access with your card or by any other electronic method;
(ii)   "ACH" will mean funds transferred electronically through the Automated Clearing House (ACH)
       network.
(iii)  "Agreement" means the Consumer Electronic Banking Agreement contained in this Consumer
       Electronic Funds Transfer Disclosure Statement;
(iv)   "ATM" will mean automated teller machine or banking machine;
(v)    "ATM operator" will mean any person that operates an ATM at which a consumer initiates an
       electronic fund transfer or a balance inquiry, and that does not hold the account to or from
       which the transfer is made, or about which an inquiry is made;
(vi)   "ATM transaction" will mean a transaction conducted through an automated teller machine or
       banking machine;
(vii)  "card" or "cards" will include PNC Banking Card, PNC Bank Check Card, or PNC Wealth
       Management Banking Card, unless otherwise specified;
(viii) "Check Card" will mean a PNC Bank Check Card;



**PNC BANK**
**LEADING THE WAY**

(ix)  "checking accounts" will include interest-bearing and non-interest bearing personal checking accounts;

(x)  "checks" will include negotiable orders of withdrawal;

(xi)  "consumer" will mean a natural person;

(xii)  "Electronic Check Conversion" – will mean a one-time electronic fund transfer where a check, draft, or similar paper instrument is used as a source of information to initiate the transfer.

(xiii)  "Non-PIN transfer" will mean a transfer made by use of a Check Card without the use of a PIN;

(xiv)  "PIN" will mean your confidential personal identification number or other confidential code assigned to you by PNC Bank or selected by you for identification purposes in connection with the use of your card or with other electronic banking transfers;

(xv)  "PIN transfer" will mean a transfer made by use of a card and a PIN;

(xvi)  "savings accounts" will include savings and money market deposit accounts; and

(xvii)  "transfer" will mean any consumer banking transaction, including deposits or withdrawals, that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a debit or credit to your account.

## Disclosures of Your Rights and Obligations

**1. Consumers' Liability for Unauthorized Transfers (excluding verified unauthorized Non-PIN transfers. See special rules for these transfers below)**

Tell us AT ONCE if you believe your card and/or Personal Identification Number ("PIN") has been lost or stolen or if you believe that an electronic fund transfer has been made without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your checking or savings accounts to which you have access, plus your maximum overdraft line of credit or the balance in any other account connected to your account for overdraft protection. If you tell us promptly after you learn of the loss or theft of your card or an unauthorized transaction, you will not incur any loss or liability if someone used your card or made a transfer without your permission. Also, if your statement shows transfers that you did not make, tell us at once. If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from making the transfer if you had told us in time.

    a. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

    b. Our business days include every day except Saturday, Sunday and a federal holiday.

    c. If you believe your card or PIN has been lost or stolen or that someone has transferred or may transfer money from your checking or savings account without your permission, call the phone number or write to the address shown at the end of this disclosure statement.

**2. Special Consumer Liability and Protection Rules for Verified Unauthorized Non-PIN Transfers:**

If your statement shows transfers using your Check Card for a Non-PIN transfer that you did not authorize or if you believe your card has been lost or stolen, tell us at once in order to prevent further misuse of your card. If we investigate the transfer and determine that it was not authorized, you will not incur any loss or liability.

## Disclosure of Types of Available Transfers and Limits on Transfers

**1.** You may access up to nine (9) PNC Bank accounts using your ATM Card. These nine accounts may be any combination of checking or savings accounts.

**2. (Note: Some of the services described in this paragraph may not be available at all ATMs. Please check the ATM machine for specific services offered.)**

    a. If you have a card, you may use your card at ATMs bearing any ATM network logo that appears on your card to:

        (i)  Withdraw cash from your accounts;

        (ii)  Make deposits to your accounts subject to any state law limitations;

        (iii)  Make transfers among your accounts;



PNC BANK

LEADING THE WAY

  (iv) Perform balance inquiries on your accounts;

  (v) Pay certain bills at ATMs either by cash, check or directly from your checking account;

 b. If you have a checking account connected to your card, you may use your card and your PIN to make PIN transfers at merchants who have agreed to accept the card for this type of transfer;

 c. If your card is a PNC Bank Check Card, you may use your Check Card to make Non-PIN transfers at any merchant where VISA® is accepted.

 d. If your card is a PNC Bank Check Card, you may also obtain cash at any VISA® member bank from the designated checking account which provides you the ability to make PIN and/or Non-PIN transfers.

3. You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to:

 a. Pay for purchases

 b. Pay bills.

4. There are maximum limits on the amount of total ATM withdrawals or purchases you may make using your card in any calendar day. The amounts of these maximum withdrawal limits will be disclosed to you when you receive your card. You may call us at the telephone number shown at the end of this disclosure statement if you need additional information on your limits. Additionally, you may be able to withdraw cash only in certain multiples, as indicated at each ATM. There are also maximum limits on the amount of total ATM deposits you may make using your card in any calendar day. The limit for PNC Wealth Management cardholders is $100,000 per calendar day; the limit for all other cardholders is $30,000 per calendar day.

5. Use of your card and/or PIN is also subject to the following limitations:

 a. You may not be able to make deposits at ATMs located outside of the state where your bank of account is located.

 b. If you have signed an agreement authorizing PNC Bank to honor telephone requests to transfer money between any of your checking or savings accounts, you can transfer funds by calling us at the phone number shown at the end of this disclosure statement, subject to the following:

  (i) For PNC Bank savings accounts of any kind, you may make unlimited withdrawals by mail, ATM or in person; you may, however, make no more than a total of 6 preauthorized, telephone or automatic transfers to other accounts or third parties during each monthly statement period, and no more than 3 of the 6 transfers may be made by use of your card or similar payment order payable to a third person.

  (ii) We reserve the right to prevent transfers which exceed the above limits or to monitor these transfers after they occur. Where we observe that the number of transfers exceeds the above limits, we will contact you for corrective action. Where excessive transfers continue to occur, or where the number of transfers shows little attempt to stay within the limitations, we reserve the right to close your savings account or convert it to an account without transfer limitations.

 c. You may not use your card or PIN to perform transactions on internet gambling sites.

 d. You may not pay for purchases at a point of sale terminal or otherwise from your savings account.

 e. For security reasons, there may be other limits imposed on the number of deposits, withdrawals or purchases you can make and the amounts you can deposit, withdraw or purchase within any period. Note also that the limits on your use of your card may be different at terminals owned by institutions other than us.

 f. There are limits on the amount of cash you may withdraw or transfer immediately after you make a deposit (see the Consumer Funds Availability Policy for more information).

## Disclosure of Charges for Automated Teller Machine Transactions

You may be charged a fee by PNC when you use an ATM not owned by PNC. In addition, you may be charged a fee by the financial institution, ATM operator and/or any network used to make a transaction. Furthermore, you may be charged a fee for a balance inquiry even if you do not complete



**PNC BANK**

**LEADING THE WAY**

a fund transfer. Refer to the Consumer Schedule of Service Charges and Fees, which may be amended from time to time, for information related to charges imposed by PNC for these services or the right to use these services.

**Disclosure of Right to Receive Documentation of Transfers**
1. You can get a receipt at the time you perform a transfer with your card.
2. If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call the phone number shown at the end of this disclosure statement to find out whether or not the deposit has been made.
3. You will get a checking or money market account statement monthly. You will also get a monthly savings account statement unless there were no transfers to or from your savings account in a particular month. In any case, you will get the savings account statement at least quarterly.

**Disclosure of Charges for Transfers or Right to Make Transfers**
There are charges for certain card transfers or the right to perform such transfers. These charges are explained in the Consumer Schedule of Service Charges and Fees, which may be amended from time to time.

**Disclosure of Right to Stop Payment of Preauthorized Transfers**
If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here's how:
1. Call the phone number or write to the address shown at the end of this disclosure statement in time for us to receive your request 3 business days or more before the payment is scheduled to be made. Be sure to tell us the name of the person or company to whom the payment is scheduled to be made and the amount of the payment you wish to stop. If you call, we may also require you to put your request in writing and get it to us within 14 calendar days after you call. You will be charged for each stop-payment order you give in accordance with our current Consumer Schedule of Service Charges and Fees. If a payment is made to the payee/merchant electronically, and the funds have already been deducted from your account, it is not possible to stop payment. Likewise, if payment is made to a payee/merchant via check and the check has already been cashed by the payee/merchant, you may not stop payment. Please refer to the General Provisions section below for more information concerning your right to stop payment of preauthorized transfers.
2. If you order us to stop one of these payments 3 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your direct losses or damages.

**Disclosure of Right to Receive Notice of Varying Amounts**
If these regular payments may vary in amount, we or the person you are going to pay will tell you 10 days before each payment when it will be made and how much it will be. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

**Disclosure of Bank's Liability for Failure to Make Transfers**
If we do not complete a transfer to or from your account on time or in the correct amount in accordance with the General Provisions section below, we will be liable for your direct losses or damages. However, there are some exceptions. We will not be liable, for instance:
a. If, through no fault of ours, you do not have enough money in your account to make the transfer;
b. If the transfer will go over the credit limit on your overdraft line, if you have one;
c. If the transfer will exceed the limitations on your savings or money market account;
d. If the ATM where you are making the transfer does not have enough cash;
e. If the terminal or system was not working properly and you knew about the breakdown when you started the transfer;



**PNC BANK**
LEADING THE WAY

f.  If circumstances beyond our control (such as interruption of telephone service or telecommunications facilities, fire or flood) prevent the transfer, despite reasonable precautions that we have taken;

g.  If you have not provided us with complete and correct payment information, including without limitation the name, address, account number and payment amount for the payee on a bill payment;

h.  If your operating system was not functioning properly; or

i.  If the transfer cannot be made because of legal restrictions affecting your account.

**Disclosure of Account Information to Third Parties**

We will disclose information to third parties about your account or the transfers you make:

a.  where it is necessary for completing transfers;

b.  in order to verify the existence and condition of your account for a third party such as, for example, a credit bureau, a merchant or another financial institution;

c.  in order to comply with government agency or court orders, or investigations or examinations by our bank regulators;

d.  in the investigation or prosecution of alleged fraudulent activity concerning your accounts;

e.  if you give us your permission; or

f.  as you may have otherwise authorized in other agreements with us.

**In Case of Errors or Questions about Your Electronic Transfers**

Call the telephone number, write us or send an email to the address shown at the end of this disclosure statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

(1)  Tell us your name and account number (if any).

(2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

(3)  Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days (for verified unauthorized Non-PIN transfers, within 5 business days), after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 calendar days, (for PIN point-of-sale transfers and/or Non-PIN transfers, up to 90 calendar days) to investigate your complaint or question. If we decide to do this, we will provisionally credit your account within 10 business days (for verified unauthorized Non-PIN transfers, within 5 business days) for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provisionally credit your account or we may reverse any credit previously made to your account. (NOTE: Please see the Special Rules For New Accounts and Foreign Initiated Transactions section below for additional information.)   We will tell you the results within 3 business days after completing our investigation. If we decide that there was no error, we will reverse any credits made and will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**Special Rules For New Accounts and Foreign Initiated Transactions:**

For errors involving new accounts, as well as for foreign initiated transactions (transfers initiated outside of the United States), we may take up to 20 business days to provisionally credit your account for the amount you think is in error and we may take up to 90 days to investigate your complaint or question.



**PNC BANK**
LEADING THE WAY

**General Provisions**

1. The signing of a signature card, your request for a card, the use of a card, the use of Online Banking services and/or the use of Online Banking through Quicken® shall mean that you agree to the content of this Agreement and to any modification thereof. Any such modification shall become effective and be binding 15 calendar days (or such later time if required by law) after notice of the modification is posted in our banking centers, or by such other method of notice as we may deem appropriate or as may be specifically required by applicable law.

2. If you enter into an agreement with someone other than us to have direct deposits made into your account or to have automatic payments made from your account, we will not be obligated to you to accept such deposits or to make such payments and may at our option reject them unless we have received notification in advance satisfactory to us regarding such deposits or payments. Certain types of deposits, including but not limited to checks that are second endorsed or are not properly endorsed, cannot be accepted at our ATMs. We reserve the right to reject such deposits. Notwithstanding the foregoing, we reserve the right to refuse or to return all or part of a deposit at any time.

3. Final credit of all transfers, deposits and payments made by you at an ATM is subject to verification by us of the actual amounts deposited and paid (including conversion rates for foreign currencies), notwithstanding the figure shown on the receipt you received at the time of deposit or payment. Funds from any deposits (cash or check) made by you at the ATM will be available to you pursuant to the terms and conditions of the Consumer Funds Availability Policy, which is included in your account information package. Where available, any bill payment made at an ATM shall be subject to verification of the amounts deposited for payment, and shall not be delivered to the payee until such verification is completed, which, along with the time necessary for transmittal of the payment to the merchant, may take up to 3 business days.

4. Other loans made to you as a result of transactions by you at an ATM (such as an advance from your overdraft line of credit, if you have one) are repayable, together with all charges due on such advances or loans, as provided in the terms and conditions of your loan agreement, as it may be amended from time to time.

5. Your card may, but need not, be retained by any ATM or merchant if:
   a. the PIN is wrong after repeated attempts;
   b. your card was reported lost or stolen;
   c. your card was closed for misuse;
   d. all of your accounts have been closed;
   e. your card expired, was replaced or not used within a two-year time period;
   f. the machine is not operating properly.

6. We may refuse to issue a card to you, or to reissue a card to you if you have previously had one. Each card issued by us remains our property, is not transferable and may be cancelled, revoked or limited by us at any time without notice. In the event of cancellation or revocation, your card must be surrendered to us upon demand. If you attempt to use your card after it has been cancelled or revoked it will be retained. For your protection, your card also may be retained in situations where it appears to us that there is or may be a danger of loss, theft or unauthorized use.

7. No electronic fund transfer may be made and no transfer that you attempt to initiate will be completed if your card is damaged, has expired, has been cancelled or revoked or is retained for any reason or your account has been closed.

8. Upon receipt of a request for authorization of a PIN transfer and/or Non-PIN transfer that you make with your card, you authorize us to deduct the amount immediately from the available balance in your account. You agree that you may not place stop payment orders on any transfers originated by use of a card except for arrangements made with payees and/or merchants for recurring payments.

9. You may not be able to use your card to make withdrawals from or transfers between your accounts, or make deposits to your savings account in the following cases:



**PNC BANK**
LEADING THE WAY

a. your checking account is overdrawn;
b. you have reached, or your request would exceed, the withdrawal or transfer limits referred to above in the Disclosures of Your Rights and Obligations:
c. you exceed your overdraft line of credit or otherwise are not in good standing with regard to the use of your card.

10. If you have instructed us in advance to make regular payments out of your account and have ordered us to stop one of those payments in the manner set forth above in the Disclosures of Your Rights and Obligations, we will, for your protection, refuse to honor any future request for six months for payment by the particular person or company involved that is in the same amount as the payment that you ordered stopped. We will, however, honor and pay future requests for payment by that person or company that are not in the same amount as the payment you ordered stopped. If you wish to stop a payment that is in a different amount than the payment you originally ordered us to stop, you will have to give us a new stop payment order. In addition, you agree that you may not place stop payment orders on any transfers originated by use of a card except for arrangements made with payees and/or merchants for recurring payments.

A written stop payment order is effective for six months and may be renewed for additional six-month periods. An oral stop payment order is effective for 14 calendar days, unless you confirm it in writing with us during that time. If an oral stop payment order is confirmed, it is effective for six months from the time the order was first given orally. Stop payment orders on Visa Check Card recurring debits are effective for two years from the date of receipt. For any stop payment order to be effective, at least one (1) transaction must have previously posted. We will accept stop payment orders provided they are properly authorized by any person with signing authority on your account, regardless of who initiated the payment.

Stop payment orders are subject to our current charge for that service.

**Stop payment orders are processed by computer. Unless the amount of the payment and other information are reported absolutely accurately, we cannot assure you that the item you want stopped will not be paid.**

11. We reserve the right at any time and without notice (except as may be required by the federal Electronic Fund Transfer Act) to eliminate any or all of the services that currently are available to you by use of your card or other electronic methods or to add new services.
12. To the extent applicable, the Account Agreement for Personal Checking and Savings Accounts ("Account Agreement") with us also applies to any consumer electronic fund transfers made from or to your accounts by use of your card or other electronic method.
This Agreement will control, however, in the event of any conflict between the Account Agreement and this Agreement.
13. We may, from time to time, limit the type, number and dollar amounts of any transfers made by use of a card, notwithstanding the amount in your accounts, and terminate or suspend the operation of any or all cards, ATMs or merchants, without notice unless otherwise required by law or regulation.
14. You agree to promptly notify us in the event your card is lost or stolen, or if you suspect any unauthorized use of your card.  YOU AGREE NEVER TO WRITE YOUR PIN ON YOUR CARD OR KEEP ANY WRITTEN RECORD OF IT IN PROXIMITY TO YOUR CARD.
15. If you have contracted with us for automated bill payment services, please refer to the Online Banking Transfer Funds and PNC Payment Services, Online Bill Pay Services Agreement and/or Online Banking through Quicken® Agreement.
16. Where you have authorized any other person to use your card in any manner, your authorization shall be considered by us to be unlimited in amount and manner and will be effective until you have notified us in writing that you have revoked the authorization, and have taken all other necessary steps to revoke it.



**LEADING THE WAY**

17. The card which we have issued to you in connection with your personal checking or savings account, and which is subject to the terms and conditions of this Agreement, may be used only for personal purposes, and may not be used for any business transfers. If any of the accounts used with your card are changed from personal to business purposes you must notify us immediately, and surrender your card.

18. You agree the card that we have issued to you will not be used for any illegal transfer(s).

19. If your account is with PNC Bank, National Association, this Agreement is subject to the laws and regulations of the Commonwealth of Pennsylvania and of the United States of America as amended from time to time. If your account is with PNC Bank, Delaware, this Agreement is subject to the laws and regulations of the State of Delaware and of the United States of America as amended from time to time.

## Basic Safety Precautions for ATM Use

1. Be alert to your surroundings, and do not use any ATM if circumstances cause you to have concern for your safety.
2. After entering, close the entry door of any ATM facility equipped with a door.
3. Place cash withdrawn from an ATM securely upon your person before exiting any ATM facility.
4. Direct complaints concerning ATM security to PNC Bank using the telephone number shown at the end of this disclosure statement.

## How to Notify Us In Case of Errors or Questions About Your Electronic Transfers

1. **For PIN and Non-PIN transfers, ATM transactions and/or banking machine disputes and electronic check conversions:**
   Call us at 1-888-PNC-BANK (1-888-762-2265)* or, at 1-800-531-1648 (TT), or write us at:
   PNC Bank Check Card Services
   500 First Avenue, 4th Floor
   Mailstop: P7-PFSC-04-B
   Pittsburgh, Pennsylvania 15219

2. **For Online Banking services and/or Online Banking through Quicken® disputes:**
   Call us at 1-888-762-2265 or, at 1-800-531-1648 (TT), or
   Send us an e-mail at: service2@pncbank.com or write us at:
   PNC Bank Check Card Services
   500 First Avenue, 4th Floor
   Mailstop: P7-PFSC-04-B
   Pittsburgh, Pennsylvania 15219

3. **For ACH transaction disputes:**
   Call us at 1-888-762-2265 or, at 1-800-531-1648 (TT)

**If your card is lost or stolen, notify us immediately by calling 1-888-PNC-BANK (1-888-762-2265).***

*In Florida, PNC Wealth Management clients should call 1-800-841-7732 during normal banking hours on our business days, and may call the above number, 1-888-PNC-BANK (1-888-762-2265), at all other times.*



PNC BANK
LEADING THE WAY

## OVERDRAFT PROTECTION AGREEMENT

Overdraft Protection: This Agreement provides the terms and conditions of the PNC Bank Overdraft Protection service. Please read this Agreement and keep it with your important account information.

1. I/we, have designated certain of my/our account(s) as PROTECTING ACCOUNT(S) for the purpose of adding overdraft protection service, and have authorized PNC Bank to apply this service to my/our designated PROTECTED ACCOUNT. If PNC has determined that sufficient funds are not available in the PROTECTED ACCOUNT to cover account withdrawals, PNC Bank will automatically transfer funds or credit from the PROTECTING ACCOUNT(S) as follows:

    A. If there are sufficient funds to cover some but not all of my/our overdrafts, PNC Bank will exercise its discretion (i) in paying some but not all of the items and (ii) to pay items drawn on the PROTECTED ACCOUNT in any order convenient to PNC Bank. In exercising its discretion to pay in any order, PNC Bank does not necessarily process items in the order in which it receives them. PNC Bank's general practice is to post withdrawals from my/our account in order of largest-to-smallest dollar item; in other words, beginning with the largest dollar item, then the next-largest dollar item, and so on until PNC Bank reaches the last, smallest-dollar item. This order of payment may affect the total number of items paid and/or the amount of NSF fees charged. For example, if PNC Bank pays the largest dollar check first, this largest item may exhaust my/our PROTECTED or PROTECTING ACCOUNT(S), and I/we may incur returned checks and/or NSF charges for each subsequent smaller dollar check that causes an overdraft. Such charges and/or returned checks, in some circumstances, may have been avoided if the smaller dollar checks or overdrafts were paid first, and the funds in the PROTECTED or PROTECTING ACCOUNT(S) were not exhausted until the largest dollar check was processed.

    B. At such time or times that PNC Bank determines that the PROTECTED ACCOUNT has insufficient funds, PNC Bank will transfer to the PROTECTED ACCOUNT an amount sufficient to pay all items creating the insufficient balance together with any applicable PNC Bank fees, first from funds or credit available in the first designated PROTECTING ACCOUNT, and, if an overdraft still exists, from funds or credit available in the second PROTECTING ACCOUNT, if a second PROTECTING ACCOUNT has been designated. If the PROTECTING ACCOUNT is a line of credit or credit card account, the amount transferred will be rounded upward to the next whole dollar.

    C. PNC Bank will not make any automatic transfer in amounts of less than $50.00.

    Effective May 22, 2009

    C. If the PROTECTING ACCOUNT is a deposit account, PNC Bank will transfer the exact amount of the overdraft, plus applicable fees, from the PROTECTING ACCOUNT. If the PROTECTING ACCOUNT is a line of credit or credit card, PNC Bank will not make any automatic transfer in amounts less than $50.00.
    Note: If a second PROTECTING ACCOUNT is a deposit account and the first PROTECTING ACCOUNT is a line of credit or credit card, transfer amounts from the line of credit or credit card to the PROTECTED ACCOUNT may be less than $50.00.

    D. This is not an extension of credit and PNC Bank shall not be obligated to transfer funds to the PROTECTED ACCOUNT if such a transfer will exceed the funds or credit available in the PROTECTING ACCOUNT(S), as designated and determined by the agreement(s) which governs the PROTECTING ACCOUNTS.

    E. If the PROTECTING ACCOUNT is a credit card, credit balances will be available for nightly processing of items and for transactions processed by branch tellers but not for point of sale or ATM overdrafts (online authorizations). All other types of PROTECTING ACCOUNTS are available for nightly processing and for online authorizations.

    F. I/we may from time to time contact PNC Bank to request a modification of this agreement by adding or substituting a different account as Protecting Account 1 or 2. PNC Bank reserves the right to accept such modification of this Agreement or to require that a new Agreement be executed.



**PNC BANK**

**LEADING THE WAY**

2. I/we understand that if any PROTECTING ACCOUNT is a line of credit or credit card account, any transfers that are made from such an account for purposes of overdraft protection will be subject to the terms of the line of credit agreement or credit card agreement, as applicable, including all rules, fees and other disclosures made with the agreement as well as any applicable fees set forth in PNC Bank's Consumer Schedule of Service Charges and Fees or the Business Checking Accounts and Related Charges. Any items from the PROTECTED ACCOUNT, which are returned, will be subject to PNC Bank's regular overdraft charge. If the PROTECTING ACCOUNT is a credit card account, this credit card may be a PNC branded card issued by a third party card issuer, and I authorize PNC Bank and such issuer to share information necessary to process my overdraft protection transactions and administer this overdraft service. I authorize PNC Bank to update the credit card account number for my Protecting Account if such issuer provides PNC Bank with a new credit card account number for me/us.

3. I/we understand that if any PROTECTING ACCOUNT is a checking, savings or money market deposit account, any transfers that are made from such an account for purposes of overdraft protection will be subject to the terms of the applicable Account Agreements for Checking and Savings accounts, and PNC Bank's Consumer Schedule of Service Charges and Fees or the Business Checking Accounts and Related Charges as applicable, together with any other disclosures provided in connection with the account. I/we understand that transfers made from any checking, savings or money market deposit account will count towards any applicable transaction limitations set forth in the Account Agreement for Checking and Savings including limitations on preauthorized transfers which are limited by federal regulations to preauthorized transfers (including telephone and automatic transfers) each statement period. Any items from the PROTECTED ACCOUNT, which are returned, will be subject to PNC Bank's regular overdraft charge.

4. This authorization may be modified and/or terminated at any time by PNC Bank upon notice to me/us and I/we understand that it will terminate automatically without notice if all PROTECTING ACCOUNTS are closed. If any PROTECTING ACCOUNT is a Home Equity Line of Credit account, then this authorization with respect to such account may not be terminated by PNC Bank except in accordance with my/our Home Equity Line of Credit account agreement.



## THE PNC FINANCIAL SERVICES GROUP, INC.
## CONSUMER INFORMATION PRIVACY PRINCIPLES

### Introduction

The PNC Financial Services Group, Inc. ("PNC") family of companies is committed to treating and using personal financial information about you responsibly. These Privacy Principles explain what personal information we collect, why we collect it, how we protect it, and how and why in certain cases we may share it among PNC companies or with select other parties. We also tell you how to exercise your personal Information Sharing and Use Choices. If you have already notified us of your Information Sharing or Use Choices, you do not need to notify us again. These principles are effective 05/01/2008 and may be amended from time to time.

Our Consumer Information Privacy Principles apply to personal information collected or used when PNC companies offer financial services to you for personal, family or household purposes. The services may include deposit, lending, investment advisory, brokerage and insurance services. This disclosure is made on behalf of all PNC companies including: PNC Bank, National Association; PNC Bank, Delaware; PNC Investments LLC; PNC Capital Markets LLC; PNC Insurance Services, LLC; PNC Equipment Finance, LLC; Harris Williams LLC and PNC Merchant Services Company.

### We Collect Information as Needed to Identify You and Serve You as a Customer

We collect information from and about you in order to identify you as our customer, establish and manage customer accounts, complete customer transactions, understand customer needs through market research, market products and services we believe meet customer needs, and comply with legal and regulatory requirements.

*Examples of the types of information we collect are:*

> **Information we receive from you, such as:**

(a) **Contact Information** (such as name, address, and telephone number). We use contact information, for example, to identify you, send you information about our products and services, and call or write you about your accounts.

(b) **Identification Information** (such as a social security number). We may need your social security number, for example, to obtain a credit report when you apply for credit with us, report interest earnings or mortgage interest payments to the IRS, or comply with other legal requirements.

(c) **Financial Profile Information** (such as income, assets, and liabilities). We use this information, for example, to process applications and make appropriate product and service recommendations to help you get the most from your relationship with PNC.

> **Information about your transactions and experiences with PNC companies.** This information, such as your account balances, payment or overdraft history, parties to transactions and account usage, permits us, for example, to process your requests quickly, recommend appropriate products, and price products and services competitively on the basis of your entire relationship with us.

> **Information we receive from third parties, such as:**

(a) **Information about your transactions with other companies.** We may use this information, for example, when you apply for credit or to verify information you have provided to us.

(b) Information about you from consumer reporting agencies (such as your credit history and credit worthiness). We use this information when, for example, we process applications, monitor and collect existing accounts, make "pre-approved" offers and as otherwise permitted by law.



(c) **Information from market research companies** (such as purchasing patterns). We use market research information, for example, to develop products we believe our customers will find most useful.

**Policies and Procedures**

PNC companies use advanced technology and information management techniques to implement security, audit and control programs designed to protect the confidentiality and security of the information we collect.

PNC limits employee access to customer information to those employees we believe have a legitimate business need for the information. We have adopted policies, procedures, employee orientation, training and education programs, and communication programs designed for the protection of customer information. It is the responsibility of each PNC company employee to comply with our Consumer Information Privacy Principles.

**We May Share Information within the PNC Family of Companies to Improve Our Services to You**

PNC offers financial services to consumers through its family of affiliated companies that provide, for example, deposit, lending, credit card, investment advisory, brokerage, insurance, trust, and related products. By sharing information about you and your accounts, we are able to offer you the convenience of round-the-clock customer service, combined statements, simple application procedures for a variety of financial services, and special discounts or other benefits. Within the family of PNC companies, we share all of the information we collect as described above.

> You may request that we do not share within the family of PNC companies information other than contact, identification, and transactions and experience information, described above, and that any information we collect not be used by any other PNC companies for marketing purposes. Please see "It's Your Choice" below to find out how to make this request.[1]

[1] *Vermont residents only: PNC will not share financial profile or credit report information among the PNC family of companies without your consent*

**We May Share Information Outside the PNC Family of Companies in Certain Cases**

It is our policy not to sell, rent or otherwise provide customer information to outside companies so they can market their non- financial products or services. From time to time, we may offer our customers the opportunity to purchase non-financial products and services offered by outside third parties, but we will not disclose customer information to these third parties unless our customers authorize us to do so.

The sections below describe the types of companies and third parties with whom, and the situations when, we may share customer information outside the PNC family of companies.

**Service Providers and Suppliers**

From time to time, PNC companies may use outside companies or suppliers to perform services for PNC, such as printing checks for our customers, preparing and mailing customer account statements, appraising property offered as collateral, verifying property ownership and processing customer transactions and assisting us in providing account benefit programs.

We may also use outside companies to perform market research and analysis for us by contacting our customers, as well as non-customers, to ask their opinions about our current or proposed products and services. Generally, we provide market researchers only with customer contact information, such as name, address, and telephone number. Occasionally, we provide them with customer account



PNC BANK
LEADING THE WAY

Information, such as type of account, balance, and whether a customer banks at a branch, at an ATM, or online.

Sometimes we use outside companies to assist us In marketing our own PNC products and services or products and services, such as mortgages and Insurance, that we offer Jointly with other financial institutions. Generally, we provide our marketing service providers only with customer contact information, such as name, address and telephone number.

Before we disclose customer information to any of our service providers or suppliers, we require them to agree to keep our customer information confidential and secure and to use it only as authorized by us.

**Select Financial Institutions**
In order to offer our customers certain financial products, such as mortgages or Insurance, we may enter into joint marketing agreements with select financial institutions outside the family of PNC companies that specialize in providing these products.

Generally, we provide these financial Institutions only with customer contact information, such as name, address, and telephone number. When we offer certain insurance products, such as credit insurance, we may provide account information, such as the amount of the loan or mortgage, maturity date, and monthly payment amount. We do not give these financial institutions customer account numbers as part of a joint marketing agreement or program[2]

We select financial institutions we work with under joint marketing agreements very carefully and re-quire them to agree to keep our customer information confidential and use it only as authorized by us.

> You may request that we do not share your information with other financial institutions for joint marketing purposes. Please see "It's Your Choice" (below) to find out how to make this request.

[2] *Vermont Residents only: PNC will share only contact information with financial institutions with which we have joint marketing agreements.*

**Other Circumstances**
We may share customer information with unaffiliated third parties when our customers request or give us permission to do so or when we are permitted or required to do so by law.
Some examples are:
(a)  When we complete your transactions, such as paying your checks, following your online payment directions, purchasing securities for your account, or processing insurance applications;
(b)  When we respond to your service requests;
(c)  When we share information with consumer reporting agencies;
(d)  When we verify account status for merchants you want to pay by check;
(e)  When we offer account benefits, such as credit card and other reward programs;
(f)  When we transfer information in connection with a proposed or actual sale of accounts, or a proposed or actual sale of all or part of a business unit;
(g)  When we suspect fraud or for risk management purposes;
(h)  When we are required by a federal, state, or local law or regulation to do so;
(i)  When we receive a subpoena or are ordered by a court to do so.

**Former Customers**
We do not disclose information about former customers to outside companies except as may be permitted or required by law. Examples of when we may share information about former customers are listed above.



**PNC BANK**
**LEADING THE WAY**

**State Privacy Laws**
We will also comply with state privacy laws to the extent they apply.

**Online Information Policies**
We respect the privacy of our customers and are committed to protecting their information on our websites with the same care we utilize for all PNC company transactions. To view our current online privacy notice, visit us at pnc.com.

**It's Your Choice**
**Option 1 – Limit Sharing and Use of Information within PNC Family**

Request this Information Sharing and Use Choice option if you do not want:

> us to share information other than contact, identification, and transaction and experience information, described above, among our family of PNC companies (except where one PNC company performs services for another) and
> any other PNC company that does not have a preexisting business relationship with you to use any information for marketing purposes.

We will continue to share among our family of PNC companies contact, identification, and transaction and experience information, as described above, but such information will not be used by any other PNC company that does not have a pre-existing business relationship with you for marketing purposes. We may, however, market the products and services of other PNC companies pursuant to joint marketing agreements.

**Option 2 – Limit Sharing of Information with Other Financial Institutions for Marketing Purposes**
Request this Information Sharing and Use Choice option if you do not want us to share any information with other financial institutions for the purpose of joint marketing of their financial services.

To exercise your choice options:

> Write to us at: PNC Information Sharing Options,
           PO Box 96066, Pittsburgh, PA 15226, or
> Call us any time at 1-800-762-2118, or
> Stop by any PNC Bank branch.

When writing, please indicate which option or options you are requesting and include your name, address and phone number. Providing an account number or social security number would be helpful but is optional.

PNC will process your request as soon as possible. However, you may receive communications for a short time based on information we shared prior to processing your request. If you have joint accounts, we will treat a request by one party to the account as applying to both parties to the account. The option or options you request will apply to accounts that each joint account holder has in his or her own name and any accounts the joint account holders have with each other.

©2008 The PNC Financial Services Group, Inc. All rights reserved.
PNC Bank, National Association
PNC Bank, Delaware
Members FDIC
Form Effective Date 04/01/09
Para servicio en español, 1-866-HOLA-PNC
TT: 1-800-531-1648
1-888-PNC-BANK
pnc.com

EFORM128827


**PNC BANK**
LEADING THE WAY